J. M. BLANCO, INC., demandante y apelada, *v.* COMISIÓN DE SUMINISTROS DEL GOBIERNO INSULAR, demandada y apelante.

Núm. 6977.—*Sometido:* Abril 8, 1936. *Resuelto:* Noviembre 16, 1936.

*Hon. Procurador General B. Fernández García (Benjamin J. Horton en el alegato)* y *Tomás Torres Pérez, Subprocurador,* abogados de la apelante; *James R. Beverley* y *Gabriel de la Haba,* abogados de la apelada.

EL JUEZ ASOCIADO SEÑOR CÓRDOVA DÁVILA, emitió la opinión del tribunal.

La corporación demandante, acogiéndose a la Ley Uniforme de Sentencias y Decretos Declaratorios, solicita la

determinación de ciertas divergencias surgidas en un contrato llevado a cabo con la demandada para suplir ciertos artículos destinados al Gobierno Insular.

█ Éste es un caso en que la transcripción de evidencia no ha sido elevada a este tribunal. Únicamente obra en autos el legajo de la sentencia y los alegatos de las partes. En la relación del caso la corte inferior establece sus conclusiones de hecho y de derecho. En cuanto a las conclusiones de hecho debemos presumir que han sido formuladas por la corte inferior ajustándose a la prueba practicada. Basados en esas conclusiones emitiremos nuestro juicio acerca de las cuestiones planteadas.

█ En 5 de mayo de 1933, la Comisión de Suministros del Gobierno Insular, a través del Negociado de Materiales, Imprenta y Transporte, celebró la subasta número 130 para el suministro de artículos de farmacia y laboratorio a la que concurrió como postor la corporación J. M. Blanco, Inc., adjudicándosele entre otros artículos las partidas números 466, 664, 666 y 668, que aparecen en el pliego de condiciones de la subasta número 130 que en unión de otros documentos presentados como prueba y admitidos por la corte forman el contrato entre la demandante y la demandada. En el referido pliego de condiciones están encasillados por numeración correlativa todos los productos objeto de la subasta, la cantidad por unidad, el consumo probable por unidad y el precio neto por unidad. El consumo probable por unidad de las mencionadas partidas adjudicadas a la demandante era de 24 kilos de sulfato de quinina respecto de la partida 466, 23 cajas de ampollas de biclhoridrato de quinina en cuanto a la partida número 664, 5 cajas de ampollas de biclhoridrato de quinina en cuanto a la partida número 666, y 5 cajas de ampollas de biclhoridrato de quinina en cuanto a la partida número 668.

Entre las condiciones generales del pliego de condiciones figura una bajo el número 13, que dice así:

"Como no es posible determinar las cantidades exactas que de las diferentes clases de artículos descritos en esta subasta ha de necesitar el Gobierno Insular durante el período del contrato, todo licitador, cuya oferta sea aceptada, estará obligado a servir los artículos que le sean adjudicados, en tales cantidades como puedan necesitarse durante el período del contrato. Las órdenes por estos artículos se expedirán a medida que se vayan necesitando los mismos. Las cantidades que aparecen en la columna 'Consumo Probable', se dan simplemente como información, y no relevarán al Negociado de Materiales, Imprenta y Transporte, de la obligación a ordenar de los contratistas todos aquellos artículos que a juicio de los diferentes funcionarios del Gobierno Insular puedan necesitar las instituciones y oficinas a su cargo, y en ningún caso relevarán al contratista de dar cumplimentación a todas aquellas órdenes que a su favor se expidieren solicitando artículos que le fueren adjudicados. No se considerará oferta alguna en que se imponga la condición de que el Gobierno Insular haya de tomar una cantidad determinada de uno, o más, de los artículos subastados.''

El referido contrato para el suministro de los materiales subastados por la demandante era por término de seis meses, a partir del 1º. de julio de 1933, y terminando, por tanto, el 31 de diciembre de 1933. Transcurridos unos tres meses del contrato, el Negociado de Materiales, Imprenta y Transporte sólo había pedido a la demandante la entrega de más o menos 15½ kilos de sulfato de quinina de la partida número 466 y aproximadamente 15 cajas de ampolletas de biclhoridrato de quinina de la partida número 664, y a la fecha de la demanda, 8 de diciembre de 1933, ya se habían pedido a la demandante 75 kilos de sulfato de quinina de la partida número 466, 37 cajas de ampolletas de la partida 664 y 8 cajas de ampolletas de la partida número 668.

En 28 de septiembre de 1933 la demandada, a través del Negociado de Materiales, Imprenta y Transporte, pasó una orden a la demandante para que despachara 175 kilos de sulfato de quinina de la partida número 466 y nuevamente, en octubre 23 de 1933, la demandada, a través del referido Negociado, pasó otra orden a la demandante para que con cargo a su contrato despachara 927 kilos de sulfato de qui-

nina de la partida número 466, 7,500 ampolletas de la partida 664, 5,000 ampolletas de la partida número 666 y 5,000 ampolletas de la partida número 668.

El total del sulfato de quinina pedido por la demandada a la demandante con cargo a la partida número 466 en las dos órdenes anteriores ascendía a 1,102 kilos, cuando la demandante había servido ya con cargo a su contrato y de la partida referida 75 kilos de sulfato de quinina o sea más de tres veces el consumo probable estimado en la columna del pliego general de condiciones de la subasta, y una cantidad de ampolletas que fluctúa entre tres y diez veces más que lo que fué estipulado en la columna de consumo probable del pliego general de condiciones de su subasta.

La demandante se negó a hacer las entregas requeridas en las órdenes de septiembre 28 y octubre 23 de 1933, alegando que las cantidades pedidas por el Negociado de Materiales, Imprenta y Transporte estaban fuera de lo razonable y de lo que las partes tuvieron en mente al otorgarse el contrato como el consumo probable de los diferentes departamentos del Gobierno Insular por el semestre de julio 1°. a diciembre 31 de 1933, y por alegar la demandante que los pedidos no eran para el Gobierno Insular o sus distintos departamentos sino para una entidad denominada Puerto Rican Emergency Relief Administration, que es parte del Gobierno Federal y a la cual no estaba obligada a servir la demandante.

La evidencia demuestra claramente, por las órdenes o pedidos de la demandada, que el despacho de las órdenes de septiembre 28 y octubre 23 de 1933 era para la Puerto Rican Emergency Relief Administration, ya que todos y cada uno de dichos pedidos estaban autorizados por su administrador Mr. James R. Bourne, con cargo a los fondos de dicha administración y para ser entragados al Negociado de Malaria del Departamento de Sanidad Insular.

A la exposición de hechos que antecede, que hemos copiado de la relación del caso de la corte inferior, debemos

añadir que la demandante alega que "a no ser por los fondos aportados por el Gobierno Federal para ayuda de Emergencia en Puerto Rico, parte de los cuales se destinaron por el Administrador Federal para la adquisición de drogas y productos químicos, el consumo aproximado o probable del Gobierno Insular no hubiera sobrepasado de las cantidades fijadas en el contrato o de haber sobrepasado no hubiera sido en cantidad mayor de la entregada por la demandante de las partidas números 466, 664, 666 y 668 del contrato."

La corte inferior, luego de sostener que el contrato que ha suscitado esta controversia carece de mutualidad y que la demandante no estaba obligada a suplir los pedidos que se le hicieron, por ser excesivos, se expresa así, ratificando su conclusión, de que tales pedidos eran destinados a la Puerto Rico Emergency Relief Administration:

"Hemos estudiado con detenimiento la legislación federal a virtud de la cual funciona la Puerto Rican Emergency Relief Administration y oído el testimonio de su Administrador en Puerto Rico Mr. James R. Bourne, así como del Ingeniero Sr. Eduardo E. Saldaña, y llegamos a la conclusión de que la Puerto Rican Emergency Relief Administration es una agencia federal que funciona en esta Isla bajo los auspicios del Gobierno Federal, con funcionarios federales y con fondos del Gobierno Federal. Demuestra este hecho el que dicha administración, según los testimonios de los Sres. Bourne y Saldaña, no está obligada a adquirir materiales a través del Negociado de Materiales, Imprenta y Transporte y que a la fecha de la vista había cesado de utilizar los servicios de esta agencia insular y tenía su propio departamento de compras y celebraba sus propias subastas, cuando de haber sido y de continuar siendo una agencia, o parte del Gobierno Insular, hubiese tenido por fuerza, y de acuerdo con las prescripciones de la Ley de 13 de marzo de 1907 y de las Resolucions Conjuntas número 14 y 19, de 13 de abril de 1916 y 10 de julio de 1923, que continuar adquiriendo los efectos y materiales por mediación de las agencias del Gobierno Insular, denominadas Comisión de Suministros y Negociado de Materiales, Imprenta y Transporte.

"La asignación de cantidades por el Gobierno Federal a El Pueblo de Puerto Rico de los fondos federales de la Administración de Auxilio de Emergencia, y utilizadas por la Puerto Rican Emer-

gency Relief Administration, no implica una donación o cesion absoluta de dichas cantidades a El Pueblo de Puerto Rico y así quedó comprobado con el testimonio de Luis E. Morales, jefe interino de la división de cuentas de la Auditoría de Puerto Rico, quien declaró que el dinero recibido se mantenía en un fondo especial o 'trust fund', conocido con el nombre de 'Puerto Rico Emergency Relief Fund', del cual era custodio don Manuel V. Domenech, Tesorero de Puerto Rico, por nombramiento de la 'Reconstruction Finance Corporation', y cuyo dinero nunca se ha mezclado con fondos insulares, siendo su solo administrador, como antes se ha expresado, el Sr. James R. Bourne, sin cuya orden no podía hacerse desembolso alguno. El administrador no es responsable de sus actos al Gobernador de Puerto Rico, ni a ninguna otra autoridad insular, y su nombramiento se origina de la *Federal Emergency Relief Act*, de 1933. Y el hecho de que esos fondos se remitan a solicitud del Gobernador y que en parte se apliquen, mediante requisiciones del Comisionado de Sanidad Insular, aprobadas por el Administrador Federal de Auxilio de Emergencia, en la compra de medicinas para la campaña contra la malaria, considerada dicha campaña como auxilio de emergencia, no convierte estos fondos federales, así utilizados para fines que compete al Comisionado de Sanidad Insular perseguir, en fondos insulares.

"En la opinión de este Tribunal, el Negociado de Materiales, Imprenta y Transporte al cursar sus órdenes de 28 de septiembre y 23 de octubre para que la demandante suministrase determinadas cantidades de los artículos subastados en las partidas números 466, 664, 666 y 668, estaba ordenando artículos para la Puerto Rican Emergency Relief Administration, agencia federal que no es parte del Gobierno Insular ni de ninguna de sus oficinas o departamentos dentro de las estipulaciones contenidas en el pliego de condiciones y muy especialmente dentro de la contenida en la propia cláusula número 13 que forma parte de las condiciones generales de dicho pliego y del contrato, y que por lo tanto, la demandante estaba en su derecho al negarse a suministrar artículos de los subastados por ella, para uso o consumo de otras entidades que no fueran el Gobierno Insular, o sus departamentos, oficinas o dependencias; y que ni la Puerto Rican Emergency Relief Administration podía pretender, ni la demandada podía consentir, en que el contrato de la demandante se utilizara para obligarle a suplir materiales de los subastados a otras personas fuera de las determinadas en el mismo y de acuerdo con la ley creando la Comisión de Suministros, Resolución Conjunta número 14 de 13 de abril de 1916 (pág. 195), tal

como fué enmendada por la Resolución Conjunta número 19 de 10 de julio de 1923 (pág. 705).''

Basándose en las conclusiones que anteceden, la corte inferior termina diciendo:

''(c) Que los pedidos de septiembre 28 y octubre 23 de 1933, verificados por el Negociado de Materiales, Imprenta y Transporte, lo eran para la Puerto Rico Emergency Relief Administration, una entidad federal, que no era ni formaba parte del Gobierno Insular, ni de ninguno de sus departamentos, oficinas o dependencias, y por lo tanto la demandante J. M. Blanco, Inc., no estaba obligada a suplir las referidas órdenes con cargo a su contrato de suministro y que dichas órdenes, al pasarse por la demandada a la demandante, sólo constituían una oferta de compra a los precios estipulados en el contrato original entre las partes susceptible de aceptación o rechazo por la demandante, y que ésta estuvo justificada al negarse a servir dichos dos pedidos.''

Dos son las cuestiones que las partes discuten, desde sus respectivos puntos de vista, sobre la interpretación del contrato alegado en la demanda. En la primera se alega que ni el Departamento Insular de Sanidad ni la Comisión de Suministro tuvieron en mente un consumo mayor del doble de las cantidades fijadas en el pliego de condiciones, y que la demandante no pudo prever que dicho consumo alcanzara una cifra mayor de dos veces la cantidad estimada como consumo, tanto por el Departamento de Sanidad como por la Comisión de Suministro Insular. Por estas razones se arguye que la demandante no está obligada a suplir los artículos que se le pidieron. En segundo lugar se alega que nunca las partes pudieron tener en mente o prever que la demandante tendría que entregar cantidades exorbitantes o crecidas de los productos o artículos adjudicados a ella para alguna persona o entidad extraña, ni para el Gobierno Federal, dentro de los precios y condiciones estipulados en el referido contrato. Se añade que a no ser por los fondos destinados por el Administrador General para la adquisición de drogas y productos químicos, el consumo aproximado o probable del Gobierno Insular no hubiera sobrepasado las

cantidades fijadas en el contrato. De manera que la cuestión fundamental que en realidad se discute es si la demandante estuvo obligada o no a suplir los artículos solicitados para una entidad extraña al Gobierno Insular y pagados con fondos de dicha entidad. No impone el contrato la obligación que se pretende exigir de la demandante. Así lo entendió el tribunal que oyó y apreció la prueba, al sostener la actuación de la demandante apelada al negarse a servir los referidos artículos. Si como dice dicho tribunal el dinero utilizado no fué donado al Gobierno Insular, si el referido dinero se mantenía en un fondo especial conocido con el nombre de "Porto Rico Emergency Relief Fund", del cual era custodio don Manuel V. Domenech, Tesorero de Puerto Rico, por nombramiento de la Reconstruction Finance Corporation, si ese dinero nunca se mezcló con los fondos insulares, siendo su solo administrador el Sr. James R. Bourne, sin cuya orden no podía hacerse desembolso alguno, es claro y evidente que el dinero referido nunca pasó a ser propiedad del Gobierno Insular, y que por lo tanto la demandante, en caso de que hubiese estado obligada a suplir dichos artículos, de acuerdo con el contrato, al Gobierno de Puerto Rico no podría estarlo para cumplir las órdenes de ninguna otra entidad.

*Debe confirmarse la sentencia apelada.*

El Juez Presidente Señor del Toro no intervino.